# CASES

IN THE

# SUPREME JUDICIAL COURT

IN

## THE COUNTY OF LINCOLN, MAY TERM, 1829.

---

## WELD *vs.* THE PROPRIETORS OF THE SIDE-BOOMS IN ANDROSCOGGIN RIVER.

Under the statute incorporating the proprietors of the side-booms in *Androscoggin* river, and the acts in addition thereto, it is the duty of the proprietors frequently to examine their piers and booms, to ascertain whether they are firm and sound, and capable of securing the property contained in them ; and the corporation is responsible for all losses occasioned by the want of ordinary care.

THIS was an action of trespass on the case, in which the plaintiff sought to recover damages for the loss of a large quantity of pine logs, by the breaking of the defendant's boom in a time of flood, in consequence of its having become rotten and defective through their negligence. The general question of the liability of the defendants was submitted to the court, upon a statement of facts drawn up by a commissioner agreed upon by the parties for that purpose.

It appeared from his report, that the private statutes of *March* 15, 1805, *Feb.* 29, 1812, and *Jan.* 31, 1820, incorporating the proprietors, and regulating their tolls, were passed at the instance of the defendants ; in pursuance of which they proceeded to erect three

side-booms in *Androscoggin* river, within the limits prescribed in their act of incorporation. The principal boom, called " the Great-carrying-place-boom," was capable of containing more than twenty thousand logs; and was extended from the west or *Brunswick* side of the river, across the channel, to within about ten or twelve rods of the *Topsham*-shore, and thence up the river, and nearly parallel to the bank, about seventy rods, forming a *cul de sac* of about twenty acres, the opening at the top being from forty to fifty rods wide.—The passage left open next to the *Topsham*-shore was closed in the year 1824 and ever afterwards, by a boom, erected by private persons owning logs in the river and usually dealing in lumber, among whom were the plaintiff and some of the defendants, which was called " the log-owners' boom." Between one and two miles farther up the river, the defendants erected another boom on the *Topsham*-side, called " the *Merrill*-boom;" and another on the *Brunswick*-side, called " the *Twitchell*-boom;" each capable of containing ten thousand logs. The Great-carrying-place-boom was supported by nine piers, lying in two ranges, erected at various times between the years 1818 and 1827; and composed of an exterior wall of timbers dove-tailed together, with chambers seven or eight feet apart, ballasted with stones. Some of these piers were not built in a workman-like manner, nor of suitable timber; and were somewhat decayed; and in most of them there was no ballast within several feet of the surface of the water in the time of the highest freshets. These decays were known only to some individuals of the corporation.

The defendants occasionally used the log-owners-boom for the delivery of logs from their own; and exacted toll for all logs detained in the river by either of them. The place of delivery for all logs, contained in either of the defendant's booms, was below the lower-boom; and when the logs in the upper booms could not be floated to this place, by reason of the great number of others obstructing the passage, the defendants paid the expense of hauling them by land.

The *Twitchel*-boom was secured to a tree on the bank, by a yoke, composed of two pieces of timber lying parallel to each other, with a cross-piece of oak, called a sword-piece, passing through each of

their ends ; all which, as well as the boom-pieces, were, after the disaster, found to be rotten. But these defects, which were wholly internal, were not previously known to the defendants. The *Merrill*-boom was strong and unbroken.

At the time of the disaster, which took place on the night of the 26th of *April*, 1827, all the booms were full of logs; with which also the surface of the river was covered for a large distance above the log-owners-boom. The flood was not quite as high as the freshet of 1820, nor as those of several previous years ; nor as high by three feet as that of 1814 ; and the quantity of logs in the river was uncommonly large, many having been detained above, for want of water, in the two preceding years. This had been the case also in 1820 and 1824, each of which years had been preceded by low freshets. In the former of these years, the quantity of logs in the Great-carrying-place-boom had been as great as in 1827, if not greater ; but the pressure would have been much less at the time of the disaster, had the passage closed by the log-owners'-boom, been left open.

The loss was occasioned by the breaking of the *Twitchell*-boom, and the Great-carrying-place boom ; by which accident the plaintiffs logs, and all others in those booms, were precipitated over the falls, and drifted into Merry-meeting bay. But which boom was first broken did not appear. The latter was broken by the pressure of logs against the pier nearest to the *Brunswick*-shore, which was the oldest, the force being so great as to carry off the upper part of the pier, as far down as the upper tier of ballast, which was several feet below the surface of the water. The timbers of this pier, between the high and low water marks, were very much decayed. Two other piers, inside the boom, to which it was fastened, and which were built in the same manner, and were equally defective, were also carried away.

After the accident in *April*, the Great-carrying-place-boom was again stretched from one of the remaining piers to the *Brunswick* shore, being about twenty-four rods, secured only by the fastening of each end ; and thus remained till *November* following ; the defendants during that time, detaining logs within it, and exacting tolls

as before. However this kind of security might suffice for the summer months, when the water was low, it was clearly insufficient against the autumnal floods ; and this through the want of seasonable care on the part of the defendants. In *November*, therefore, it was broken by the flood ; and the plaintiff's logs were swept off and lost, to the value of a hundred dollars. But before this time, the owners of the logs, in expectation of the usual autumnal freshets, ought to have rafted out their logs from the boom.

One of the directors of the corporation, and some of the members, knew the situation of the Great-carrying-place boom before the disaster, and deemed it insufficient ; but this was unknown to the boom-master, and all the other officers, except that director. But the commissioner certified his opinion that *competent skill* and discernment would have pronounced the piers deficient ; but that gross negligence was not imputable to the corporation, unless it legally resulted from the knowledge of the director.

As to the *Twitchell* boom, he was of opinion that considering the latent character of its defects, a prudent and diligent owner might well be presumed to be ignorant of them.

And he was also of opinion, that, had the passage closed by the log-owners' boom been always open, then the Great-carrying-place boom would probably have withstood any pressure which would have been brought against it ; and that in such case the defendants would not have been liable.

*Greenleaf* and *Mitchell*, upon the facts thus found, argued against the liability of the defendants. The form of the action being in *tort*, the plaintiff evidently founds his claim on the violation, by the defendants, of some duty created by the statutes of incorporation. But no such duty is created. The defendants are merely authorized to " stop, raft, and properly secure" the logs for the owners. The statutes constitute them bailees for hire ; and leave the measure of their liability, and the mode of remedy, to be determined by the rules of the common law. It is plain therefore that the remedy should have been in *assumpsit*, and not in *tort*.

But even as bailees, they are not liable. The benefits of the bailment being mutual and reciprocal, the defendants are bound only

for ordinary care; and this care they appear to have taken. They were not bound perpetually to maintain booms, but only allowed to erect them; and the toll is granted for the custody of logs; not as a premium for insuring their safety.

The damage was occasioned by the erection of the log-owners' boom, which closed up the passage which the defendants had left open. This act was an illegal obstruction; and against the authors of it, and those only, the plaintiff has his remedy.

But if the defendants were liable as bailees, for the loss of logs from their boom, yet here they are not responsible, the loss in *April* having been occasioned by an extraordinary casualty. And as to the loss in *November*, it was the fault of the plaintiff not to have rafted out his logs before the autumnal floods.

*Allen* and *Packard*, for the plaintiff.

The opinion of the court was read at the ensuing *September* term as drawn up by

MELLEN C. J. In the examination of this cause, the first inquiry is, " What are the powers and liabilities of the defendants in their corporate capacity, created by the several statutes which make a part of this case, or resulting from the principles of the common law. The act of *March* 15, 1805, incorporating the defendants, is the principal basis of the plaintiff's claim against them. By the first section they were incorporated " for making, laying and maintaining side booms, in suitable and convenient places in *Androscoggin* river, from *Androscoggin* bridge to the narrows of said river, in *Brunswick* and *Topsham.*" By the fourth section the corporation are authorised to receive of the " respective owner or owners of logs and other lumber by them stopped in said river, rafted and properly secured for the owner, the following fees, &c." By the fifth section it is declared that " it shall be lawful for the said corporation, by their several agents and servants, to be appointed as aforesaid, to hold and retain any logs or other lumber, by them stopped in said river, rafted and properly secured for the owner as aforesaid, until payment or tender of the fees respectively which shall have thereby become

13

due to the said corporation." The acts of *February* 29, 1812, *January* 31, 1820, and *March* 15, 1821, either authorise an extension of the booms under certain limitations as to distance, or increase the fees claimable by the corporation ; but they do not vary the rights and liabilities of the defendants in any other respects ; these remain as established by the act of incorporation. The case finds that all the foregoing acts were passed on the application of the defendants, and that they have accepted them, and enjoyed the privileges granted thereby. Prior to the act of incorporation, we must understand that the owners of logs and other lumber in *Androscoggin* river took charge of the same themselves, and secured them in such a manner as they thought proper ; with or without any expense to themselves, according to existing circumstances. But by the provisions of the act that privilege is taken away, and transferred to the corporation, who have a right to hold and detain all logs and lumber, stopped, rafted and secured, until the established fees are paid. This view of the character of the law and of the powers it has granted will aid in its construction, as to the nature and extent of the duties and liabilities on the part of the corporation.

It has been contended that the act imposes no liabilities, except the loss of toll in cases where the owners lose their logs. But we apprehend this to be clearly a mistaken construction. The right to demand and receive toll or fees is given only for logs and other lumber, " stopped, rafted and secured." The duty to secure the property and the right to compensation for securing it, are both created *uno flatu ;* and the acceptance of the act, with the privileges it confers, is an engagement to perform the duties it enjoins. The question then is, what are those duties? and what is the extent of the responsibility of the defendants? It is said that the law was never intended to subject them to damages for loss of logs and other lumber, occasioned by an unusual or extraordinary rise and swell of the river. The preamble to the act states that it would be of great public as well as private advantage, by side booms, to stop and secure " masts, logs and other lumber which are drifted down said river." It would seem that the defendants and the legislature must have had reference to those freshets in the river which are annually, and sometimes oftener, ex-

perienced, whereby property is drifted down to, and over the falls at *Brunswick*, and totally lost. It must be presumed that the proprietors were acquainted with the character of the river and the peculiar danger to which logs and lumber were exposed in a sudden swell of its waters; and, besides, it must be remembered that the design of the booms in question was to secure property from these very dangers. This the defendants were willing to undertake for a certain established compensation, calculating upon a profit to themselves; and considering the vast number of logs which the booms often contain, as appears from the facts, the compensation allowed by law seems to be an ample one. The counsel for the plaintiff has considered him in the light of an involuntary bailor, and the defendants as bailees for reward. It is well known that the extent of a bailee's liability, depends on the nature of the bailment. If the bailor only receives the benefit of the bailment, the bailee is answerable only for gross neglect. When the bailment is mutually beneficial, the bailee is answerable for no more than ordinary neglect; which is the omission of that care which every man of common prudence takes of his own concerns. And when the bailee only is benefited by the contract or bailment, he is responsible for slight neglect; which is the omission of that diligence and care which every circumspect and thoughtful person uses in securing his own property. *Jones* on bailment, 14, 15, 106. Upon these principles, it is contended, as the defendants were bailees of the logs of the plaintiff for a purpose profitable to them, and without any consent on the part of the plaintiff, they are responsible to him in damages, provided, upon the evidence before us, his property has been lost by even their slight neglect. In *Riddle v. Proprietors of the locks and canals on Merrimack river*, 7 *Mass.* 169, the plaintiff's boat got aground in the canal for want of sufficient depth of water. The judge instructed the jury that it was the duty of the proprietors to keep their canal in proper order; and that the receiving of toll amounted to an undertaking that the canal was passable. The whole court sanctioned the instructions and entered judgment on the verdict. Upon the question as to the extent of liability, the counsel for the defendants has cited the case of *Townsend v. President, &c. of the Susquehanna Turnpike Company*, 6 *Johns.*

90, and *Harris & ux. v. Baker*, 4 *Maull & Selw.* 27. In the former case an injury was sustained by the breaking of the most essential timber in a bridge, by means of which other parts gave way and fell. It appeared that there was a latent defect in the heart of the stick of timber which had destroyed its strength. The jury gave a verdict for the plaintiff, which the court refused to set aside; saying, however, that the defendants were answerable only for ordinary neglect. The latter case seems to have no bearing on this. The defendant was not the immediate cause of the injury, nor under special obligations to diligence and care by reason of any pecuniary consideration, as in the present case.

On the whole, we do not consider the defendants as liable to the same extent as a common carrier, whose accountability is avowedly placed on reasons of policy, which do not seem applicable to a case like the one at bar. The line of distinction between slight and ordinary neglect, it is sometimes difficult to draw; and taking all circumstances into view, we are inclined to adopt the opinion that the defendants, under their act of incorporation, and the influence of common law principles in its construction, are holden for all losses occasioned by the want of ordinary care, attention and diligence. In common cases this is a question submitted to the jury as the proper tribunal. In the present case, however, the parties have agreed on a commissioner to ascertain and report all the facts in relation to the subject in controversy; and his report is now before us; and on this we are to decide whether the defendants are answerable to the plaintiff for the damages assessed by the commissioner, or any part of them. As the parties authorised him to collect and report facts only, we are not at liberty to regard any of his opinions, calculations or reasoning, upon any part of the facts.

The prominent facts relied on by the plaintiffs to shew the alleged negligence, are—

1. The insufficient ballasting of the piers to which the Great-carrying-place boom was fastened; the ballast having been placed in chambers in the piers, instead of forming a solid body of stones from the bottom to the top, which would have given them sufficient firmness and stability to resist any probable pressure and violence,

even after the timbers were in some degree weakened by their age. The fact is, that this boom gave way, by means of the top of the piers, above the ballast, having been carried away ; or at least several of them. The freshet in 1814, was three feet higher than in *April* 1827 ; and in 1820 there were as many logs in the boom as in 1827, and still it withstood the pressure ; probably because the timbers were then much more firm, being comparatively new. The height of the water in 1814 was a notice to all concerned, what height and solidity of piers would be necessary to secure logs and timber for the owners.

2. The top of one of the piers was found hanging to the boom the morning after the disaster, and this was old and defective; and some of the timbers, between wind and water, were almost entirely decayed.

3. The *Twitchell*-boom had a serious defect in it ; the sword pieces, connecting the logs composing the yoke, were entirely rotten, and this occasioned the boom to give way. The logs also composing this yoke, were found so rotten after the freshet, as to be unfit for further service. It is true these sword pieces, to a casual observer, had the appearance of being sound. These were the principal defects in piers and booms, on the strength of which so much property was annually depending for security from loss. For a more particular account of these deficiences, we refer to the statement of the commissioner ; merely observing that a man of respectability and one of the directors, who was admitted a witness by consent of parties, testified that before the disaster, he considered the piers insufficient for the reasons before stated, viz. the badness of the construction, the unsuitableness of the timber, and insufficiency of the ballasting, with the deterioration arising from decay in the part where the water rose and fell. And the commissioner concludes by saying that he considered " the weight of testimony as establishing it as a fact, that competent skill and discernment would have pronounced them insufficient." It is stated that there is no reason to believe that the defendants, as a corporation, were sensible of the fact : but it is also expressly stated that *Nahum Perkins*, one of their directors, was aware of the fact. How is a corporation to know a fact but

through some of the members of it? They may see the fact, or it may be communicated to them. Whatever the defects were, here is abundant proof of a *scienter*, whether necessary or not, to the maintenance of this action. Taking the foregoing facts into consideration, respecting the nature and extent of the defects which have been described, there can be no hesitation in pronouncing them such as clearly to prove the insufficiency of the piers and booms, for the important purpose for which they were intended. And as the defendants were receiving toll for securing the logs, year after year, it was their duty frequently to examine the piers and booms, to ascertain whether they were firm and sound, and capable of securing the property as the legislature must have contemplated. And yet the report states no facts shewing that this duty was performed. It is not enough that the timbers, or logs, or sword pieces, should appear to a casual observer to be sound, when they are defective, and in some instances totally rotten. Had proper examination been made every year, these dangerous defects must have been discovered. Surely this is ordinary neglect, to give it the mildest name ; and when, in addition to all this, it is proved that before the disaster, one or more of the directors were aware of these defects and deficiencies, and yet no measures were taken to repair and strengthen the piers and booms, we cannot but deem the defendants as guilty of even gross neglect, in the instances before mentioned.

The remaining inquiry is whether the unauthorised log-owner's boom, which was placed and continued across the eight-rod passage, was the occasion of the disaster. This boom, it seems, was made by sundry individuals, some years before ; the plaintiff was one of them, and some of the members of the corporation also assisted in placing it there. It is contended that if the eight-rod passage had been left open, those logs which came down the river after the Great-carrying-place boom was full, would have passed on and gone over the falls, instead of increasing the pressure on the Great-carrying-place boom ; and that such being the case, the defendants are not responsible, even though their piers and booms were defective and insufficient as abovementioned. On this point some other facts must be examined. It appears that the current of the river

sets into the Great-carrying-place boom, and all logs floated down the river, if not obstructed, are carried directly into said boom ; of course, when that boom was full, logs coming down the river and passing diagonally to the eight-rod passage, would still, by the power of the current, be forced against the body of logs in the boom, and increase their pressure on the boom ; though, as the report states, it would have been much less, if the passage had been kept open, than when closed by the log owner's boom. But though the corporation were not instrumental in placing that boom there, yet the report states that they " uniformly exacted boomage or toll, as provided in said statutes, as well for logs which lay above said log owner's boom and above the logs within their boom, as for those which were within the same ;" and this boom was " used by the defendants occasionally to deliver logs which they considered as within their boom, to the mill men below it." The defendants " considered all logs, so situated, however high up river they may have extended in manner aforesaid, as within their boom, and exacted and received toll accordingly." These facts shew that the defendants, so far from objecting to the continuance of the log-owner's boom, as an inconvenient obstruction, or as endangering the piers and boom below, were constantly and uniformly availing themselves of its use and effect as a source of income ; and in the exaction and receipt of toll, considering and treating it as a part of their own boom. Under these circumstances we are of opinion that they cannot be permitted to relieve themselves from accountability, by shewing that possibly that boom might have, in some degree, contributed to the disaster. They ought not to complain of that boom, as soon as a loss has happened, and yet uniformly derive advantage from it in the form of toll, until it has happened ; *qui sentit commodum, sentire debet et onus.* Connected with this subject, another part of the evidence demands attention. It does not appear which boom first gave way ; the Great-carrying-place boom, or *Twitchell's* boom. If the former gave way in consequence of some extraordinary pressure from logs above ; might it not have been a pressure from the logs contained in the latter, when it gave way and suddenly permitted ten thousand logs to rush down against the body of logs below ? If the

loss was occasioned by the breaking of *Twitchell's* boom, as that was singularly defective, the defendants must be answerable for its effects on the great boom below, and the consequent loss of the plaintiff's logs. The opinion of the commissioner, hypothetically stated, near the close of his report, as to the sufficiency of the piers in case the eight-rod passage had always been kept open, and insufficiency of them in case the liability of the defendants does not depend upon that circumstance, cannot alter the case, in the view we have taken of the cause. The nature and extent of the deficiency, are facts, which opinions cannot change, except as to their legal effect; and of this the court are now the judges.

Our opinion, thus far, has had relation more particularly to the disaster in *April*, 1827. As to the loss in the *November* following, there seems to be no ground whatever for the defence. The report states that the " evidence was satisfactory, that it was owing to want of reasonable care and diligence on the part of the defendants;" and he adds, " the logs might and ought to have been rafted before that time." We are sensible the cause is an important one in itself, and in its character and consequences; and have, therefore, endeavored to examine it in all its bearings and principles. In the same degree that public policy requires the encouragement of booms on account of the valuable and important purposes for which they are designed, and which they generally accomplish, it requires also that those who own and superintend them should carefully guard the property committed to their care, and secure it from loss and injury by the means prescribed by law. Honesty and good faith on their part are not all that are required of them. They must use all reasonable care and diligence that those means shall prove effectual; otherwise the law, under which they have been incorporated, would be productive of more injury than advantage, by depriving the owners of logs and other lumber, of the power of exercising their own care and watchfulness over their own property, and transferring that power to others, who, though amply rewarded for their expense and trouble, by their neglect and want of care, expose it to danger, and occasion its loss.

We are all of opinion that the action is well sustained, and that the

plaintiff is entitled to judgment for the damages assessed by the commissioner, viz. $700, and interest on that sum from the commencement of the action.