## C. CRANE & CO. v. FRY.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1903.)

### No. 488.

**1. EVIDENCE—RELEVANCY.**
Plaintiff sued defendant corporation for the value of certain railroad ties alleged to have been lost through defendant's negligence in operating a boom. The contract for booming the ties was made by plaintiff with a man who was general manager of defendant, and also of another company, which originally constructed the boom. A question at issue was whether the contract was made with defendant or such other company, and plaintiff introduced evidence to show that defendant used the boom and collected sums due for its use by others, claiming that defendant had operated the boom for years. *Held*, that evidence was admissible on behalf of defendant to show that the sums so collected were accounted for to the other company, as explaining the transactions shown by plaintiff's evidence, and tending to negative his claim.

**2. SAME—EXPERT TESTIMONY—OPERATION OF LOG BOOMS.**
The proper conduct and management of a log boom, and what is practicable to be done in its operation, are matters of expert knowledge, and expert testimony is admissible on an issue as to negligence or improper management in handling logs therein.

**3. CONTRACTS—ACTION FOR BREACH—PLEADING.**
A declaration alleged a contract by defendant to boom timbers for plaintiff, and that, through negligent operation of the boom the timbers were lost. In one count it was alleged that defendant operated the boom as owner, and in another as lessee. *Held*, that defendant's title to the boom was immaterial, and that if it made the contract, and was operating the boom in either capacity, it was responsible, and plaintiff was entitled to recover, under the declaration, for any loss resulting from its want of ordinary care.

**4. BOOM COMPANIES—LIABILITIES—MEASURE OF CARE REQUIRED.**
The operator of a boom contracts to care for and deliver logs floated into the boom, and is bound to the exercise of ordinary care and diligence in performing the contract in accordance with the general usage and methods of operation; and, in the absence of such care, good faith and honesty do not relieve it from liability for a loss resulting.

**5. SAME—ACTION AGAINST—INSTRUCTIONS.**
Instructions asked by defendant in an action against a boom company to recover for loss resulting from its refusal to release plaintiff's logs when requested considered, and *held* properly refused.

**6. CORPORATIONS—LEGAL ENTITY—OWNERSHIP OF STOCK BY STOCKHOLDERS OF SECOND CORPORATION.**
The fact that all of the stock of a boom company has been purchased by stockholders of another corporation, and is held for its benefit, does not make the latter the owner of the property, franchises, or business of the boom company.

---

¶ 4. See Logs and Logging, vol. 33, Cent. Dig. § 34.

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Huntington.

John H. Holt, W. R. Thompson (C. W. Campbell, on the brief), for plaintiff in error.

Geo. J. McComas, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge. This was an action at law brought by Chapman Fry, a citizen of West Virginia, against C. Crane & Co., a corporation of Indiana, to recover for the loss of 30,000 railroad ties belonging to the plaintiff, which, by the alleged fault of the defendant, were swept out of a boom on Twelve Pole river, in Wayne county, W. Va.; the boom, as alleged, being leased to or operated by the defendant. The defendant pleaded the general issue, and, the verdict being for the plaintiff, the case is now here on exceptions by the defendant to certain rulings of the court.

The plaintiff offered evidence tending to prove that the plaintiff, who before that time had gotten out timber on Twelve Pole river, in Wayne county, using this boom, had requested a certain Fletcher Garrett, who had been at one time an employé of the defendant, and who was at that time getting out timber on Twelve Pole river and using the boom, to see Mr. Crane when he went to Cincinnati, and find out what they would charge to boom his ties. The reply by Mr. Crane to Mr. Garrett was that the charge for booming the plaintiff's ties would be 1½ cents for each tie, and thereupon and upon that understanding the plaintiff put his ties into the creek, and they were floated into the boom.

The first question which arose was, with whom was the contract made? The plaintiff contended that he knew no one except the defendant corporation, C. Crane & Co., of which C. Crane was the general manager, and through whom, as the manager of the defendant corporation, he had done business in connection with lumbering on the Twelve Pole river for several years. On the other hand, the defendant contended that, in making the contract with the plaintiff, Mr. Crane was acting as the president and general manager of the Twelve Pole Land, Lumber & Boom Company, a corporation which had originally constructed the boom, and the stock in which was owned by the same persons who were the stockholders in the corporation of C. Crane & Co. To support the plaintiff's contention, he offered testimony that C. Crane & Co. operated the boom as if it was its own; that it had paid the superintendent and laborers, collected the dues for booming in its own name—and gave in evidence other circumstances tending to show control of the boom business by the defendant, and dealing with it as an absolute owner would. To support the defendant's contention that C. Crane & Co. did not carry on the boom business as its own, the defendant offered to prove that certain payments which the plaintiff and his witnesses had testified were made to C. Crane & Co. for charges for booming were by C.

Crane & Co. credited to an account of the Twelve Pole Land, Lumber & Boom Company in the defendant's books.

The questions propounded to the defendant's witness asked him to state what became of certain sums which the plaintiff had testified he had paid to C. Crane & Co. for booming his ties, and to state if C. Crane & Co. had accounted to the Twelve Pole Land, Lumber & Boom Company for those several amounts. To these questions the plaintiff objected, and the court sustained his objection, and these rulings constitute the fifth, sixth, and seventh assignments of error.

There was proof tending to show that C. Crane was the treasurer and general manager of C. Crane & Co., the defendant corporation, and was also the president and manager of the Twelve Pole Land, Lumber & Boom Company, which had constructed the boom in question. He could, therefore, have contracted with the plaintiff in either capacity. No definite statement was made by either party to the contract at the time it was made as to who was the party contracting with the plaintiff; but many circumstances were detailed in testimony consistent with the contention that the defendant, C. Crane & Co., operated the boom, and, among other circumstances, the fact that it received and paid out all the money received or expended for the operations of the boom. The defendant offered to explain the receipt and payment of the money by showing that C. Crane & Co. accounted for the money as money received on account of, and for the use of, the Twelve Pole Land, Lumber & Boom Company. The weight of the testimony would have been for the jury, but we are of opinion that it was testimony pertinent to the issue, and was admissible. When the general manager of C. Crane & Co. named the rate for booming the plaintiff's ties, nothing was actually said inconsistent with defendant's contention that he was then acting for the boom company. The jury were asked by the plaintiff to find that Crane was acting for C. Crane & Co., and to find from its acts that C. Crane & Co. was operating the boom, or held itself out as so doing, and, among other acts, the fact that C. Crane & Co. used the boom for its own timber, and collected toll from others whom it permitted to use it. If the defendant could show that it did really pay over and account to the boom company for the tolls collected for booming, it would be a pertinent circumstance tending to prove the defendant's contention. If the defendant took toll for itself from those using the boom, it could not disclaim operating the boom; but if it took the toll not for itself, but for the use of the boom company, it should be allowed to prove it. We think the rejection of the defendant's offer of this testimony was error.

The second, third, and fourth assignments of error relate to the refusal of the court to allow the defendant to ask a witness familiar with the working of booms in West Virginia whether or not it was practicable to open the boom and release the plaintiff's ties without at the same time taking out the other timbers in the boom, and the further question whether the operator of a boom under a contract to boom ties is obliged to open the boom, at the instance of an owner of a part of the lumber in the boom, until the owners of the other lumber in the boom have had a reasonable opportunity to prepare

to take care of their lumber as it is turned adrift at the opening. The ground of the plaintiff's action was that, at a time when the backwater from the Ohio river afforded a suitable opportunity to open the boom and release his ties, the defendant, through its boommaster in charge, refused the plaintiff's request to open the boom upon the ground that the other owners of logs, including the defendant itself, had not been able to procure the necessary chain dogs for rafting their logs, and therefore the boom could not be opened without causing the other owners to lose their timber by its floating off into the Ohio river. Those who operate a boom are bailees for hire, and in handling of the logs they have in charge, and in maintaining the boom, are held to an ordinary degree of care; that is to say, that degree of care which an ordinarily prudent man would in that business exercise in respect to his own property. 4 Am. & Eng. Ency. of Law, p. 717, tit. "Boom Companies." The operators of a boom are not insurers, nor have they the duties of a common carrier, but their obligations are similar to those of warehousemen, wharfingers, and bailees of like character. The plaintiff's allegation was that his losses occurred because of the neglect of the defendant to properly construct, maintain, and handle the boom, and to deliver his logs to him on his demand. The defendant's defense on the merits was that it had not failed in any duty, and had done all that was practicable. The proper conduct of a boom, and what is practicable to be done, and what not, is a matter of expert knowledge, proper to be explained to the jury by competent testimony; and we are of opinion that it was error to refuse to allow the defendant to introduce this expert testimony since it was pertinent to the question whether the defendant had failed in its duty or not.

The eighth assignment of error is to the granting of the motion of the plaintiff to strike out so much of the testimony of the witness Williams as gave his own practice in operating his boom. We think the witness, if he was competent to speak of the general usage in operating booms, might have been allowed to testify to the general usage; but the ruling was right as to the testimony stricken out, because it was only as to the witness' own individual practice.

The eighth and ninth assignments of error are to the refusal of the court to grant instructions Nos. 2 and 3 offered by the defendant. They were as follows:

"(2) The jury are instructed that the plaintiff cannot recover upon the first special count in the declaration without proof that the defendant was the owner of the boom and the boom privileges therein mentioned, and, as such owner, was operating said boom and exercising said boom privileges at the time alleged in said count; and, inasmuch as there is no evidence tending in any appreciable degree to prove such ownership of said boom and boom privileges by the defendant, the jury are instructed to disregard said special count in said declaration."

Instruction No. 3 asked by the defendant and refused by the court was as follows:

"(3) The jury are instructed that no recovery can be had upon the only remaining count in the declaration by the plaintiff without proof by a preponderance of evidence that, at the times of the alleged breaches of the contract herein described, the said defendant was operating the said boom and

exercising said boom privileges as lessee thereof from the Twelve Pole Land, Lumber & Boom Company. Proof that the defendant received the tolls for booming ties of the plaintiff is not sufficient proof that the defendant was such lessee of said boom and boom privileges."

The instruction, objected to by the defendant, given by the court, of its own motion, in lieu of the foregoing instructions asked by the defendant, was as follows:

"The court instructs the jury that unless they believe from the evidence in the case that the defendant, C. Crane & Co., was, at the time of the making of the contract referred to in the declaration, and of the injuries complained of therein, the actual operator of the boom referred to in the declaration and the evidence, they cannot find for the plaintiff in this action."

The first special count of the declaration alleged:

"That the defendant, C. Crane & Co., a corporation, was at the time of committing the breaches of contract hereinafter complained of, and for a long time prior and subsequent thereto, the owner of a certain boom and boom privileges in said Twelve Pole river at said town of Ceredo, and then and there had their said boom located and were exercising said boom privileges at a point," etc. * * * That said defendant, C. Crane & Co., a corporation, was then and there engaged in carrying on a general boom business for hire and reward under and by virtue of its ownership of the stock of the Twelve Pole Land, Lumber & Boom Company, a corporation duly chartered under the laws of West Virginia in September, 1890, and, as assignee of all the property right of said company and C. Crane & Co., a corporation as aforesaid, held itself out as the owner of said boom and said boom privileges, as engaged in a general boomage business at said point for hire and reward, as fully competent to conduct said business, and as fully equipped for the same to all of the citizens, owning and handling timber along said river, and especially to this plaintiff."

The declaration further averred that the plaintiff and defendant entered into a contract whereby the said defendant agreed, undertook, and promised, in consideration of the sum of 1½ cents per tie, to be to it by this plaintiff thereinafter paid, to skillfully, properly, and safely catch, boom, and handle all said railroad cross-ties, etc.

The second special count of the declaration alleged that the defendant, C. Crane & Co., a corporation, was at the time of committing the breaches of contract hereinafter complained of, and for a long time prior and subsequent thereto, the lessee of certain boom and boom privileges in said Twelve Pole river, etc., and was then and there engaged in carrying on a general boomage business for hire and reward under and by virtue of a lease for said boom and boom privileges from the Twelve Pole Land, Lumber & Boom Company, and held itself out as the lessee of said boom and said boom privileges, as engaged in a general boomage business at said point for hire and reward, as fully competent to conduct said business, and as fully equipped for the same. The declaration then alleges a contract between the plaintiff and defendant whereby the defendant agreed to skillfully, properly, and safely catch, boom, and handle all such railroad ties owned by plaintiff in said river, and then alleges breach of the contract by the defendant, in the unskillful and improper management of the boom so that the ties were allowed to escape into the Ohio river and were lost. The substance of the allegation, in both special counts, as to the defendant's connection with the boom, is that the defendant was operating the boom, and, as the operator of the boom,

made the contract with the plaintiff. Whether the defendant was controlling and operating the boom as owner or as lessee was immaterial. If it was operating the boom and made the contract, it was liable for the breach of the contract, no matter whether it was owner or lessee, or merely intruded itself and took possession, and operated the boom because it was in possession. Its title to the boom was unimportant, if it made the contract alleged. A declaration is not a criminal indictment. As this suit is for the breach of a contract, it is sufficient if the contract be set out or alleged and proved. The alleged contract is between the plaintiff and the defendant on their own behalf, by which the defendant, for a certain hire, undertook, on its own account, to properly boom and deliver the plaintiff's ties. If the jury found the contract to boom as alleged, then the allegations concerning defendant's title to the boom were mere surplusage and inducement, and need not be proved.

We think the refusal to give the defendant's second and third instructions was right, and that the instruction given by the court correctly stated the law of the case on the points involved.

The fourth instruction asked by the defendant and refused by the court asked the court to instruct the jury with regard to the duty of the operator of the boom. The court was asked to say that it was the duty of the operator of the boom to have consideration for the interests of all the persons having timber in the boom, and not to open it at the request of one owner of lumber until all others had been notified and had a reasonable opportunity to take care of their property. The instruction proceeds:

"(4) And if the jury find that ties of the plaintiff and logs of others drifted into the boom at the June rise, and that, when the plaintiff appeared to request that his ties be turned through the boom, there were other logs of other owners in said boom, and who had not then had a reasonable time to prepare to care for their logs on the opening of the boom, and before they could reasonably get ready to raft said logs the backwater receded so that the boom could not be opened, then the jury should not find for the plaintiff on account of the subsequent loss of any ties in the boom, unless their subsequent loss was due to a subsequent breach of duty owing to the plaintiff, of which subsequent breach there is no evidence. And if the jury find from the evidence that the refusal of the person in charge of the boom mentioned in the declaration to open the boom at the request of the plaintiff after the breaking of the boom, on or about April 18, 1901, and before the second breaking of the boom, on or about May 20th following, was in good faith, and because there were no chain dogs with which to raft and care for said logs in said boom, then the jury should not find anything for the plaintiff on account of any ties in the boom at the time of such request to open said boom."

With regard to this rejected instruction asked for in its entirety by the defendant, it may be said that, without considering any other part of it, the last clause is clearly not sustainable. The last clause asserts the proposition that no matter how negligent and without excuse, in fact, was the want of preparation to boom their logs on the part of the owners of timber in the boom, other than the plaintiff, yet if, on account of their unpreparedness, the action of the boom master in refusing to open the boom at the request of the plaintiff was in good faith, and because there were no chain dogs with which to raft the saw logs, then the plaintiff should not recover. This would put it in the power of the other owners of property in the boom to

compel the plaintiff to wait their convenience indefinitely, and require him to take all the risks of the breaking of the boom by floods, and the delays from the receding of the back water from the river, and yet have no recourse against the operator of the boom for refusal to deliver the plaintiff his property, provided the operator of the boom acted in good faith, no matter how recklessly and wantonly the other owners of property in the boom may have acted. This cannot be the law. Honesty and good faith is not all that is required of the operator of a boom, any more than it is the measure of what is required of other bailees for hire. The operator of a boom contracts to care for and surrender the property floated into the boom. The peculiar nature of the bailment, and the general usages and the generally understood methods of operating booms under similar environments, may regulate and determine what is reasonable care and diligence; but it is the exercise of proper care and diligence, and not mere good faith and honesty, which is the test of the performance of the contract. Weld v. Proprietors of Side Booms, 6 Me. 99. We think, also, that the general propositions expressed in the sentences at the beginning of the proposed instruction do not correctly state the law applicable to the present case. The instruction asked the court to say that the operator could not be required to open the boom at the instance of any one owner of logs until the other owners had received a reasonable notice, giving them a reasonable opportunity to care for their property. But it failed to instruct as to whose duty it was to give such notice, and, under the instruction as asked, the boom operator might escape liability even if the owners of logs failed to be ready because of the failure of the boom operator to give the notice. This would have been an especially defective instruction on the facts of this case, because the defendant corporation which the plaintiff contended, and the jury found, was operating the boom, and which he contended, and the jury found, had contracted with him, was also a very large owner of the logs in the boom, and it was the unreadiness of the defendant to take care of its own logs which was given by the boom master as the reason for his refusing to open the boom at the request of the plaintiff.

The defendant also excepted to the court's refusal to give its fifth instruction. The fifth instruction, after reciting that the plaintiff's action was based not on any negligence of defendant resulting in the breaking of the boom, but upon the alleged wrongful refusal to open the boom and allow the plaintiff's ties to pass through prior to the floods which broke the boom, proceeds to state the law as follows:

"(5) In considering the question whether or not there was any refusal to open said boom on either of such occasions referred to, and whether such refusal or refusals to open the boom and to pass the plaintiff's ties through was wrongful and violative of the rights of the plaintiff in the premises, the jury should take into view the rights of other owners of property in said boom, and the obligation of the operator to all owners of property in said boom. If, in view of all the facts and circumstances disclosed by the evidence introduced, the jury find that such refusal to open the boom was not wrongful, then they should find for the defendant."

This proposed instruction would have left it to the jury to find a verdict for the defendant if, in view of all the circumstances, and the

defendant's obligation to others having logs in the boom, they found the refusal to open the boom not wrongful, without giving the jury any instruction as to what duty the defendant did owe to the plaintiff. The jury could not sensibly pass on the question of the negligence or breach of contract unless they were properly instructed as to what that contract required of the defendant, and what failure or default would constitute negligence and a wrongful refusal. We think this instruction was properly refused.

The defendant also excepted to the refusal of the court to grant its eighth instruction, which was as follows:

"(8) The jury are instructed that the shareholders in a corporation are distinct persons from the corporation itself, and the property and rights and privileges of a corporation are not the property, rights, and privileges of the stockholders. If the jury find from the evidence that the shares of stock in the Twelve Pole Land, Lumber & Boom Company were purchased from the original incorporators, and transferred to C. Crane, J. O. Cole, and J. E. C. Kohlsaat, they thereby became the owners of the shares so transferred, but not of any property and privileges owned by said company; and, if the jury find that said persons purchased said stock and hold the same in trust for the corporation of C. Crane & Co., still that holding of shares of the capital stock of said boom company would not make the corporation of C. Crane & Co. either the owner or lessee of the boom and boom privileges of the said Twelve Pole Land, Lumber & Boom Company."

We think this instruction correctly states the law, and that it was error to refuse it. The instruction would, of course, be inapplicable if the jury, from all the facts and circumstances found by them, were satisfied that the defendant, no matter by what right or title or claim, was actually operating the boom in its own behalf, and taking the tolls for its use, and made the contract with the plaintiff; but it correctly states the law with regard to the difference between owning shares in a corporation, and owning the property on which the value of the shares is based.

The defendant also excepted to the court's refusal of its ninth instruction, which was as follows:

"(9) If the jury believe from the evidence that C. Crane was at the time he was approached by Fletcher Garrett in Cincinnati, and the contract was entered into as testified by said Garrett, the president and general manager of the Twelve Pole Land, Lumber & Boom Company, and had been such president and general manager since the year 1892 or 1893, when the stock in said company was transferred by Vinson and others, and that said Crane, as such president and general manager of said Twelve Pole Land, Lumber & Boom Company, entered into said contract for and on behalf of the said company, and that the ties, the loss of which is complained of by the plaintiff, were put into the boom under the contract aforesaid, then no act of C. Crane & Co. in collecting the toll, giving receipts, or paying expenses of the said boom subsequent to the making of the said contract or putting the ties into the Twelve Pole river would make them liable for the loss thereof."

We think this instruction would, if granted and unexplained, have tended to mislead the jury. One question for the jury to decide was, with whom was the contract made, and who was actually operating the boom? The witness Crane testified that in making the contract he was acting for the boom company, but the jury were not obliged to take his statement. The plaintiff and his agent, Garrett, testified to the contrary; and the jury, in this conflict, were entitled to con-

sider all the facts and circumstances prior and subsequent which tended to support either contention. It would have been misleading to the jury to say to them that in considering the testimony, and determining who made the contract, no act of the defendant in collecting toll and paying the expenses of the boom after the making of the contract would make them responsible under the contract, if the contract was made with the boom company, because the only purpose for which testimony of these facts was introduced was to show that it was the defendant who was actually operating the boom, and that it was on the defendant's behalf that C. Crane made the contract. We think the instruction was properly refused.

The defendant also excepted to a modification of its tenth instruction, without which modification the court refused to give it, but did grant it with the court's modification. The instruction is as follows:

"(10) The jury are instructed that the plaintiff cannot recover against the defendant without proving by a preponderance of evidence that the defendant, C. Crane & Co., a corporation, entered into the special contract mentioned in the declaration with the plaintiff to boom his ties. If such contract was entered into with C. Crane personally, or with the Twelve Pole Land, Lumber & Boom Company, then your verdict should be for the defendant."

The court, before granting the instruction, added:

"Unless you should further find from the facts and circumstances adduced in evidence that the defendant subsequently ratified and adopted such contract."

This modification was obviously intended to have application to that hypothesis of the instruction that the jury might find that the contract was originally made with C. Crane personally, in which case there was abundance of evidence for the jury to consider tending to prove that the defendant had ratified and adopted the contract. We think there was no reversible error in the modification.

The defendant also excepted to the court's refusal to give its eleventh instruction, which was as follows:

"(11) If the jury find from the evidence that the plaintiff could have hauled out what ties there may have remained in said boom from the June rise until the break in December, 1901, and protected himself against loss by water, it was his duty to take them out, and the jury should not find their verdict against the defendant."

No testimony has been brought to our attention from which the jury would have been justified in finding that it was practicable for the plaintiff to have hauled out any of his ties, and we find in the record no evidence to sustain the hypothesis of the instruction, and it was therefore properly refused.

The defendant's twelfth instruction, which was refused, is quite similar to the ninth, and, for reasons before stated with regard to that instruction, was properly refused. The court's instruction to the jury clearly told them that unless at the time of the making of the contract, and of the loss complained of, the defendant was the actual operator of the boom, the plaintiff could not recover. By this instruction their minds were distinctly directed to the question, on whose behalf was the contract made? and there was no issue left for them to consider as to whether the plaintiff, after a contract made

with the boom company, was misled by any acts of the defendant. When C. Crane made the contract, if the plaintiff's witness Garrett was believed by the jury, nothing was said about who was operating the boom; and, if the jury so found, then the jury would properly find that the contract was made by C. Crane on behalf of the actual operator of the boom. If the actual operator was the defendant, then Crane made it on its behalf. If the boom company was the actual operator, then he made it on its behalf, as he claims he was the general manager of both. If the jury found, as the witness C. Crane testified, that he told the witness Garrett it was the boom company that would expect to be paid 1½ cents a tie for the privileges of the boom, even then, if it was the defendant that was in fact operating the boom in its own behalf, the defendant would be liable for the injury caused by its wrongful refusal to surrender the plaintiff's ties. We think the defendant's twelfth instruction was properly refused.

There remains to be passed upon an exception by the defendant to the admission of testimony offered by the plaintiff. The plaintiff, as a witness in his own behalf, was asked:

"Q. At various rises from April to December, 1901, about how many ties of yours went out into the Ohio river?" And the plaintiff answered: "I think there must have been seventy thousand."

The plaintiff had testified that the boom broke on April 18, 1901, and was repaired, and that between that time and May 2d, when it broke again, he had floated down 20,000 ties in the boom, which would have been delivered to him if the boom master would have consented, on his request, to open the boom, and that, in consequence of the boom master not opening the boom, they went into the Ohio river when the boom broke again, on May 2d, and were lost to him. He testified that later in the season 10,000 more of his ties came down the creek into the boom, and were kept there by the refusal of the boom master to open the boom until after the backwater had begun to subside, when he did get out about 400, but after that the water subsided so that it was impossible to get out any more, and they remained in the boom until December when they were swept out and lost in the Ohio river. He testified that besides these two lots of 20,000 and 10,000, for the loss of which he was suing in this action, he had lost fifty or sixty thousand ties which went out into the Ohio river, but it does not appear that he was suing for that loss. It further appeared from his testimony that he made an effort to recover from the Ohio river as many of his logs as he could, and did recover 8,889 ties. It was in order to enable the jury to justly apportion the ties recovered to the whole number lost that the question objected to was allowed by the court to be asked and answered. We see no error in this.

Because of the exceptions mentioned in this opinion as sustained, the judgment is reversed, with directions to set aside the verdict and award a new trial. Reversed.