NEW YORK TRUST CO. v. BERMUDA-ATLANTIC S. S. CO., Limited.

BRUCE et al. v. BERMUDA-ATLANTIC S. S. CO.

(District Court, S. D. New York.  December 31, 1913.)

1. MARITIME LIENS (§ 38\*) — LIENS FOR REPAIRS AND SUPPLIES — FEDERAL STATUTE.

A New York corporation, which held an option for the purchase of a foreign steamship, for the purpose of avoiding the United States navigation laws and obtaining a Canadian charter for the vessel, caused a corporation to be organized in Canada which took title to the vessel, caused its registry in Canada, executed a mortgage thereon, and chartered it to the New York Company, and never did any further business.  Its capital stock was owned entirely by the New York Company, which also controlled it through dummy directors of its own election who had no interest.  The charter prohibited the charterer from creating liens on the vessel, but it in fact obtained repairs and supplies, some of which were not paid for.  *Held*, that under Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1192), which gives a lien for repairs and supplies furnished on the order of the owner or of a person authorized by him, those furnishing repairs and supplies to such vessel were entitled to liens which took precedence over the mortgage, of which they had no knowledge, whether the two corporations be regarded as identical or as separate entities with the Canadian Company as principal and owner of the vessel and the New York Company as its agent.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 71–77; Dec. Dig. § 38.\*]

2. MARITIME LIENS (§ 38\*) — LIENS FOR REPAIRS AND SUPPLIES — FEDERAL STATUTE.

In such case it is immaterial whether or not those furnishing repairs and supplies had knowledge of the provisions of the charter party, under the proviso in section 3 of the act, denying a lien when the furnisher knew, or by the exercise of reasonable diligence could have known, that, "because of the terms of a charter party," the person ordering was without authority, since the orders were given after the charter was signed and with the full knowledge and acquiescence of the Canadian Company, and it is only where actual authority is wanting that the proviso applies.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 71–77; Dec. Dig. § 38.\*]

In Equity.  Suits by the New York Trust Company, trustee, against the Bermuda-Atlantic Steamship Company, Limited, and by Charles A. Bruce and others against the Bermuda-Atlantic Steamship Company.  On exceptions to report of special master.  Exceptions overruled.

The following is the report of the special master:

I. These proceedings in equity grew out of the filing of bills of complaint, June 8, 1912, one by the New York Trust Company, as trustee, to foreclose a mortgage upon the steamship Oceana made by Bermuda-Atlantic Steamship Company, Limited, a corporation organized and existing under the laws of Canada (and hereinafter called the "Canadian Company"), and the other against the Bermuda-Atlantic Steamship Company by Charles A. Bruce and others, as holders of notes and of a majority of the capital stock of that company, which was incorporated under the laws of the state of New York (and hereinafter called the "New York Company").  A receiver was appointed who took possession of the steamship Oceana.

Various claimants filed petitions of intervention, and the court, by orders

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

dated June 12, 1912, appointed the undersigned special master "to take proofs and determine the nature, extent, and amount of the rights, liens, equities, and priorities of the several creditors of the defendant and to report thereon to this court with all convenient speed." Subsequent to June 12, 1912, various other creditors filed petitions or claims with the undersigned as special master, asserting maritime liens upon the steamship Oceana, and the receiver duly filed answers thereto; the principal claimants in amount being the Berwind-White Coal Mining Company, the Morse Dry Dock & Repair Company, and the Robbins Dry Dock & Repair Company. Other claims as enumerated below were also filed of the nature set forth after the names of the said claimants respectively.

II. The Berwind-White Coal Mining Company, the Morse Dry Dock & Repair Company, the Robbins Dry Dock & Repair Company, and other claimants of maritime liens contend that the amounts of their several claims constitute maritime liens upon the steamship Oceana under and by virtue of the act of Congress of June 23, 1910, "relating to liens on vessels for repairs, supplies or other necessaries," and under the maritime law previously obtaining in the courts of the United States. In this behalf the contention inter alia is urged that the real owner of the steamship Oceana is the New York Company, and the Canadian Company was the latter's "dummy" or instrumentality created and used by it for the sole purpose of taking and holding the legal title to the steamship and enabling the New York Company to obtain a registry and a flag under which the ship could be sailed and operated. There is practically no dispute as to the facts upon which this latter contention is based.

The steamship Oceana, which is substantially the only asset out of which any of the claims filed herein can be satisfied, was built in 1891 at Dumbarton, Scotland, and was constructed and is suitable for passenger traffic only. On September 30, 1910, it was chartered by its then owner, the Hamburg-American Line, to the Bermuda-Atlantic Steamship Company, the predecessor company of the present the Bermuda-Atlantic Steamship Company, a New York corporation. The charter party contained an option to the charterer to purchase the steamer for £40,000 Sterling.

On December 8, 1910, the predecessor company was dissolved, and the new company of the same name, but of supposedly broader powers, was organized and adopted or took over the charter. The present New York Company was organized with a capital stock of $250,000, equally divided between common and preferred, and the shares issued are distributed between the B. C. M. W. Company, one of the complainants in the second above-entitled suit, Philip Manson, and certain other individuals. After a short period of operation under the charter party, the charterer decided to exercise the option of purchase and agreed with the Hamburg-American Line upon the terms and conditions of sale. Owing to the provisions of our navigation laws, it was impracticable for the New York Company to get an American register for the steamer, and the Canadian Company was therefore formed, called Bermuda-Atlantic Steamship Company, Limited, having a capital stock of $100,000, divided into 1,000 shares of the par value of $100 each.

In this connection the facts in detail are as follows:

At a meeting of the directors of the New York Company, February 5, 1911, a resolution was passed authorizing the president and the secretary of such company to do everything necessary or proper to exercise the company's option to buy the steamer, and the executive officers of the New York Company, or any two of them, were by resolution authorized and empowered to cause to be formed, under the laws of such state or nation as counsel might advise and under such name as the executive officers or any two of them should deem proper, a corporation for the purpose of taking title to the steamship Oceana. February 15, 1911, the New York Company, by its president, wrote the Hamburg-American Line advising that the Bermuda-Atlantic Steamship Company, the charterer of the Oceana, would exercise its option to purchase the Oceana on or before the 11th day of May, 1911, in accordance with the terms of the option of purchase contained in the charter party. March 6, 1911, the president of the New York Company reported that the company had given notice that it would exercise its option to purchase the steamship

pursuant to the authority given on February 5th for the creation of a cor-
poration "for the purpose of taking title to the steamship," and, pursuant to
the resolution, the Canadian Company was incorporated on April 25, 1911,
at the instance and at the expense of the New York Company, which paid
the bill of the Canadian solicitors engaged to form the Canadian Company.

The incorporators of the Canadian Company were: Messrs. Strachan
Johnston, Reginald Holland Parmenter, Arthur John Thompson, William Sy-
mon Morelock, solicitors, and George Ogston Merson, all of Toronto, Canada.
These incorporators were in part members of the firm of Thompson, Tilley &
Johnston, solicitors of Toronto, employed by the New York Company to in-
corporate the Canadian Company, and in part gentlemen associated with
them by that firm for said purpose. On the day the Canadian Company was
formed, a meeting of its shareholders (the incorporators above mentioned)
was held at the office of the said solicitors at Toronto, at 5:30 p. m., and it
was resolved:

"That the board of directors and officers of this company be and they here-
by are authorized and empowered in their absolute discretion to purchase the
steamship Oceana from the Hamburg-Amerika Linie, for a consideration not
to exceed forty thousand pounds sterling, and to mortgage or cause to be
mortgaged the said vessel to secure all or any part of the said purchase price
upon such terms and conditions and in such manner as to the board of di-
rectors and officers may seem proper in their absolute discretion."

It was further resolved at said meeting:

"That the board of directors be and they are hereby authorized to take
all necessary or convenient proceedings to register the steamship Oceana as
a British vessel at such port of registry and in such manner as to them may
seem proper in their absolute discretion."

It was further resolved at said meeting:

"That the board of directors and officers of the company be and they are
hereby authorized and empowered to charter said steamship Oceana to the
Bermuda-Atlantic Steamship Company, a New York corporation, for such
term and consideration and upon such terms and conditions as may to them
seem proper in their absolute discretion."

At the same meeting Strachan Johnston, W. S. Morelock, and R. H. Par-
menter were elected directors; and at 6 p. m. on the same day a meeting
of said directors was held at Toronto, at which Johnston was elected presi-
dent of the company, and Merson treasurer, and "share certificates for unpaid
shares" were issued to them and to Parmenter, Thompson, and Morelock, the
other incorporators, "being the shares subscribed for by them in the memo-
randum of agreement and stock book of the company." Then Morelock trans-
ferred his "one share (unpaid)" to A. S. Rockwood, and resigned as director,
and Rockwood was appointed director in his place; Johnston resigned as
president, and Rockwood was appointed president in his place; Merson re-
signed as treasurer, the transfer of one share from Parmenter to George
Norris was approved, Parmenter resigned as director, and Norris was ap-
pointed in his place; "shares (not paid)" were transferred, one from John-
ston to Thomas Roberts, Jr., one from Thompson to Charles A. Bruce, and one
from Merson to William S. Lare; and "Mr. Johnston, having ceased to be a
shareholder, resigned from the board." Thereupon the meeting adjourned to
30 Broad street, New York, the offices of Curtis, Mallet-Prevost & Colt, where
all future meetings were held. Rockwood, Norris, Roberts, Bruce, and Lare,
who thus became the holders of the "shares (unpaid)," and officers of the
company, were employés in the office of Curtis, Mallet-Prevost & Colt. Bruce
is also the complainant in the suit against the New York Company.

On April 27, 1911, the New York Company, by Mr. Culver, its president,
wrote the Hamburg-American Line inclosing a form of mortgage of the ship
"in compliance with the terms of the contract * * * dated September
30, 1910," stated that the New York Company had placed the matter in the
hands of its counsel, Messrs. Curtis, Mallet-Prevost & Colt, requested that
the Hamburg-American Line refer it to its counsel, and stated concerning the
proposed mortgage:

"You will note that the mortgagor named in the draft mortgage is Ber-
muda-Atlantic Steamship Company, Limited, a corporation organized under

the laws of the Dominion of Canada, to which company we hereby request that you transfer the title to the 'S. S. Oceana' in accordance with the terms of the contract of September 30, 1910, upon its compliance with all the terms of the said contract."

A further agreement was made between the New York Company and the Hamburg Line, dated May 2, 1911, which, after reciting the charter of the Oceana, and the exercise of the option to buy by the New York Company, required the Hamburg Line to make the bill of sale to the New York Company "or its nominee or assignee," excepted from the transfer the wines, liquors, cigars, and provisions aboard, but gave an option to purchase these, fixed the purchase price of the ship at £37,000 required that £20,000 of that amount be paid May 11, 1911, that the New York Company on or before May 29, 1911, give written notice to the Hamburg-American Line of the former's nominee to take title, name a date on or before May 31st for payment of the balance of the purchase price and closing the transaction, when a bill of sale to the New York Company's nominee would be delivered by the Hamburg Line, required the New York Company, on the date of such delivery, to deposit £14,000 of the purchase money, and interest thereon from May 11th, with the New York Trust Company, such deposit to be paid to the Hamburg-American Line on the joint order of certain gentlemen named, counsel for the Hamburg Line, and other gentlemen named, counsel for the New York Company, said order to be signed upon receipt of a written notice from the German consul at New York that the ship's registry had been canceled at Hamburg; and a note for the balance of the purchase price, £3,000, was to be given May 11th, secured by a chattel mortgage on certain passenger equipment and fittings of the ship described in a schedule annexed to the agreement; and the agreement also contained the following, the "Bermuda-Atlantic Line" therein referred to being the New York Company:

"The Bermuda-Atlantic Line hereby recognizes that the granting to it by the Hamburg-American Line of an extension of time to take title after May 11th, the date under which the Bermuda-Atlantic Line would have had to take title under the original contract (Exhibit A), is granted in order to give the Bermuda-Atlantic Line an opportunity to arrange for placing the Oceana under a flag other than German, on advantageous terms; and, in consideration of such extension, the Bermuda-Atlantic Line agrees to use its best efforts to make the necessary arrangements for putting the Oceana under a flag other than the German flag and to obtain other than German registry for her, and to close this transaction at the earliest possible date after May 11th, but not later than May 31st.

"The Hamburg-American Line agrees from and after the hour of noon on May 11, 1911, to and including the time when the title is passed hereunder, to let to the Bermuda-Atlantic Line, and the Bermuda-Atlantic Line agrees to hire the said steamship Oceana at a rental of one dollar ($1). The Bermuda-Atlantic Line shall keep said vessel tied up at the Port of New York during such period, and shall provide suitable officers and crew for the protection and care of said vessel, and pay all expenses connected with the vessel's maintenance. The Hamburg-American Line shall not be called upon to incur any cost or expense whatsoever in connection with the care and maintenance of the steamship Oceana after the hour of noon on May 11th, 1911.

"The Hamburg-American Line hereby agrees to hold harmless the Bermuda-Atlantic Line, the Oceana, and the Bermuda-Atlantic Steamship Company, Limited, or their assigns, from the infliction of any penalty upon the steamship Oceana by the German government for any matters or things whatsoever occurring prior to the cancellation of the Oceana's German registry, provided that the Oceana is placed legally under a flag other than German on or before May 31, 1911, and provided further that the Oceana be not retransferred under the German flag for a period of at least twelve months."

At a meeting of the board of directors, May 27th following, the president of the New York Company reported that, pursuant to the terms of the contract, $97,300, the equivalent of £20,000, had been paid by the New York Company to the Hamburg-American Line in part payment of the purchase price of the ship. The said agreement of May 2d, made with the Hamburg Line by the New York Company's president, and the said payment of $97,300, were

ratified. The secretary presented the letters patent of the Canadian Company, and the treasurer of the New York Company reported that "this company has paid the sum of $500 cash" to the Canadian Company "for account of the subscriptions of the signers of the application for said letters patent." "The acts and deeds of the officers of this company in paying the expenses of the formation" of the Canadian Company, and in paying said $500 "for account of the subscriptions of the signers of the application for letters patent," were ratified. It was resolved that the company borrow $60,000, or any less sum, from the New York Trust Company, for which sum the president or vice president and treasurer or secretary of the company were authorized to give the company's note or notes bearing interest not exceeding 6 per cent. "and to pledge as collateral security to such note or notes such securities owned by this company which this company may now own, or may hereafter acquire, as to said officers may seem proper in their absolute discretion, and to execute any renewals or substitutions of such note or notes, and to make such substitutions of collateral as to said officer may seem proper in their absolute discretion." And it was also resolved as follows:

"That this company, being, or about to be, the controlling stockholder of the Bermuda-Atlantic Steamship Company, Limited, consent to the said Bermuda-Atlantic Steamship Company, Limited, entering into an agreement with the New York Trust Company whereby the officers and directors of the Bermuda-Atlantic Steamship Company, Limited, shall be and remain clerks in the office of Curtis, Mallet-Prevost & Colt, for the protection of the trust company in the making of a loan on the stock of the said Bermuda-Atlantic Steamship Company, Limited, as collateral, until the making and completion and delivery of the mortgage upon the steamship Oceana to the New York Trust Company, as trustee, and the delivery of said bonds to the New York Trust Company, as collateral to the note of this company, which at that time the New York Trust Company may hold."

At the same meeting it was also resolved:

"That any two officers of this company be and they hereby are authorized and empowered, in their absolute discretion, to make and execute for and in the name of this company a charter party of the steamer Oceana upon such terms and conditions as to such officers may seem proper in their absolute discretion; such charter party to be in such form as may be approved by counsel."

The Hamburg-American Line then gave the New York Company an extension of time until June 10th, to take out registry of the ship "other than German"; and thereafter, in accordance with the direction of the New York Company, hereinbefore mentioned, the Hamburg-American Line made a bill of sale of the ship to the Canadian Company, dated May 31, 1911, at New York, and a bill of sale of the ship's passenger equipment; the New York Company paid the Hamburg-American Line $68,337.03, including interest from May 11th, the same being balance due on the purchase price, notice having been received from the German Consul at New York that the ship's German registry had been canceled; and a note was delivered of the Canadian Company for $14,595, dated August 11, 1911, to the order of the Hamburg-American Line, secured by a chattel mortgage on the passenger equipment of the ship. It had been agreed that the New York Company would cause such mortgage to be given by the party who should be named by the New York Company as purchaser. The note was subsequently paid by the New York Company.

Application to the register of shipping of Toronto, dated June 2, 1911, for the registry of the ship in the name of the Canadian Company, was made by Messrs. Rockwood and Lare, as respectively president and secretary of the Canadian Company, and a declaration of the Canadian Company's ownership, of the same date, was also made by them. The ship was then registered in the name of the Canadian Company as owner. The New York Company paid the bill of the Toronto solicitors for their services in attending to this registration.

June 12, 1911, the charter of the ship, containing the provisions upon which the parties' contesting liens rely, was made from the Canadian Company to the New York Company. These provisions are:

"That the charterer shall provide and pay for all provisions, coal, fresh wa-

211 F.—63

ter for boilers, port charges, pilotages, agencies, commissions, consular charges, wages, and consular shipping and discharging fees of the captain, officers, engineers, firemen and crew; and shall keep said vessel insured and pay therefor for the benefit and to the satisfaction of the owners; and shall also pay for all cabin, deck, engine room and other necessary stores; and maintain her in a thoroughly efficient state in hull and machinery for and during the service; and shall also pay all other charges whatsoever which might be chargeable against said steamship.

"The charterer will not voluntarily, or except in case of absolute necessity, create or suffer to be created, any lien or charge upon said steamship; that the charterer will pay and discharge any lien or charge whatsoever which may attach to said steamship, and all claims which may arise or be made against the owner or owners, on account of supplies, repairs, services, advances of money, towage, pilotage, wharfage, salvage, damages for collision, breaches of contract of affreightment, negligence of the crew or others, or for any other cause whatsoever."

Under this charter party the New York Company took possession of and operated the Oceana in the transportation of passengers between New York and Bermuda. The vessel flew the British flag. Her port of registry was marked plainly upon her stern.

By the terms of the charter party, which was drawn by the attorneys for the New York Company, the New York Company agreed to pay to the Canadian Company hire at the rate of $2,000 per calendar month in advance on the 1st day of each month beginning June 1, 1911, and, in addition, the sum of $14,813.93 on August 11, 1911. This latter sum was the amount of the note of $14,595 given by the Canadian Company for the equipment and secured by the latter company's chattel mortgage, with interest and other additions. In fact, nothing was ever paid by the New York Company by way of charter hire. The only account book of the Canadian Company seems to have been a thin volume (Exhibit 14), described as a combined cashbook, journal, and ledger in which appear very few entries. In addition to this book, there was a bank pass book in which but one deposit was entered, and that was the $500 supplied by the New York Company to pay for the stock required to qualify the incorporators of the Canadian Company. No cash other than this was ever received by the Canadian Company, no check was drawn in its name, and no payment made by it. The Canadian Company's name appeared on the office door of an accountant whose office was in Toronto, but it had no other office. It had no stationery, and it does not appear that a letter was ever written in its name. The capital stock of the Canadian Company was owned by the New York Company from the beginning, and none of it was ever parted with except as security for loans made to the New York Company.

The officers of the two companies, as well as their directors, at all times knew of the existence of the charter and of its terms. Most of these officers and directors were residents of or did business at the port of New York, and at all reasonable times were accessible to any one that might have occasion to ask concerning their relations to the Oceana. The New York Company had an office at 290 Broadway, where a copy of the charter was kept, and during part of the time the company's treasurer had an office at 60 Broadway. Manson, one of its officers active in its management, at all times had a copy of the charter party.

Under the authority of the resolution of May 27, 1911, the New York Company, which had acquired the bonds of the Canadian Company in exchange for the vessel, borrowed $60,000 from the New York Trust Company on the New York Company's note. This note originally was secured by pledge of 1,000 shares of the stock of the Canadian Company pending the preparation of the bonds secured by the mortgage, and the amount of the loan was used in the purchase of the Oceana.

June 5, 1911, the statutory mortgage and deed of trust were executed by the Canadian Company, as mortgagor, and by the New York Trust Company, as trustee, and temporary bonds in the amount of $100,000 were issued which in the early part of July were surrendered in exchange for the definitive bonds called for by the terms of the mortgage. The trust company was advised of

the general situation, including the relations of the two companies, except that the terms of the charter party were not brought to its attention, and the loan was made by the trust company with the special view to its being secured by bonds of the owner of the vessel.

Three equal payments aggregating $15,000 were made on account of this note by the New York Company, and on each occasion $5,000 in amount of bonds were withdrawn from the pledge. On February 13, 1912—the day of the last of the three payments—the New York Company took up the original note and substituted a new note for $45,000 due four months after date, with interest at 6 per cent. Upon maturity demand was made, and payment of this note was refused. Whereupon, after notice to the New York Company, the $85,000 of bonds remaining in pledge were sold at public auction and were bought in by the trust company for its own account for $42,500, which being applied to the indebtedness left $3,579.75 due from the New York Company to the New York Trust Company, no part of which sum has been paid. The New York Trust Company accordingly is the holder for value of $85,000 face value of bonds of the Canadian Company and has filed its claim against that company for such amount. It has likewise filed a claim for the amount of the deficiency aforesaid against the New York Company upon its note of February 13, 1912, to wit, $3,579.75.

The Canadian Company, having failed to pay the first installment of interest on its bonds secured by the trust mortgage and likewise the principal sum of $10,000 due on bonds Nos. 1 to 10, inclusive, the trustee, in accordance with the terms of the mortgage, declared the principal of all the bonds to be due and payable and instituted the foreclosure proceedings.

No charge is made by any of the parties that the New York Company procured the organization of the Canadian Company with any view to defeat the liens of persons making repairs upon or furnishing supplies to the Oceana. The purpose was, and is generally conceded to have been, simply to secure a flag for the vessel.

Some of the lien claimants were advised by officers of the New York Company, before such claimants made repairs, or furnished supplies, to the Oceana, that the Oceana was owned by the New York Company, and others did their work or furnished supplies under the impression, gathered from the circumstances, that such was the fact. Such was the understanding on the part of Manson and others interested in that company, including apparently even its counsel, who assumed that material and supply men had liens for materials and supplies furnished, notwithstanding the facts of the enrollment and the charter party, and Manson testified that if inquiry had been made of him by any material or supply man he would have stated that the New York Company owned the vessel.

III. In this situation it seems clear that, if the controversy upon the point of whether the New York Company is to be regarded as owner of the vessel for the purpose of creating maritime liens concerned only the two companies and the material and supply men claiming liens, there would be no difficulty in concluding that the claims of such liens should be sustained. But it is urged that a different result must be reached because of the fact that the trust company made its loan upon the security of the bonds of the Canadian Company secured by a mortgage upon the steamer. It must be remembered, however, in this connection that the trust company at the time of making its loan was advised that the Canadian Company had been organized and existed only for the purpose of enabling the steamer to be operated under the British flag, and was charged with knowledge that the very situation which now exists with reference to maritime liens might come about to the prejudice of its mortgage lien.

I do not understand that it is necessary to find intentional deceit as the object of forming the Canadian Company in order to find that the claims of lien "for repairs, supplies or other necessaries," under the federal statute of June 23, 1910, may be sustained on the basis of the practical identity of the two companies. In my opinion it is enough if persons of ordinary business capacity and experience believed from the circumstances that they were dealing with the owner of the vessel and would have a lien, and if the application of the rule of separate corporate entities to companies one of which is a

mere instrumentality of the other would have the same result as might have been expected had the instrumentality been formed for the purpose of defrauding materialmen. In the circumstances I find that the trust company is in no better position than it would have been if the Oceana had been registered in the name of the New York Company as owner and its loan had been made nominally as well as really upon the security of the latter company's property.

The doctrine of separate corporate entity, however, is in general so important and disregard of it so likely to result in serious inconvenience and disturbance in many cases that I come to my conclusion as above with some hesitation. This doubt impels me to examine the claims of lien from another standpoint.

Assuming that the two companies should be considered as in all respect separate and independent entities, the claims of liens must be examined with further reference to the federal lien act of June, 23, 1910.

This act, so far as material to the questions here, is as follows:

"An act relating to liens on vessels for repairs, supplies, or other necessaries.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled: That any person furnishing repairs, supplies, or other necessaries, * * * to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"Sec. 2. That the following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"Sec. 3. That the officers and agents of a vessel specified in section two shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, but nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies or other necessaries was without authority to bind the vessel therefor."

A full understanding of this act implies a knowledge of the law as it stood at the time of the passage of the act, the supposed evils of that law, and the remedy intended by Congress.

It is well known that at the time of the passage of the act some confusion existed in the law relating to materialmen's liens on vessels, and general dissatisfaction with certain anomalies of our law in this regard was evidenced by two bills that were submitted to Congress for the purpose of amending the law with respect to such liens. One of them subsequently became the act of June 23, 1910. Among the supposed evils which the act was intended to remedy were those which grew out of the decisions of the Supreme Court of the United States in the case of The General Smith, 4 Wheat. 438, 4 L. Ed. 609, and The St. Jago de Cuba, 9 Wheat. 409, 416, 417, 6 L. Ed. 122. In The General Smith, the Supreme Court first drew the distinction between "foreign" and "domestic" vessels, as those terms afterwards came to be understood. In The St. Jago de Cuba the court declared: (1) That it was not in the power of any one except the master to give implied liens on a vessel; and (2) that when the owner is present "the contract is inferred to be with the owner himself on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived." By the act of June 23, 1910, it is seen that the doctrine of presumption of credit to the owner which was recognized in the St. Jago de Cuba has been done away with, as has been the distinction with reference to foreign and domestic vessels.

Prior to the passage of this act, it was necessary to comply with the requirements of the state statute in order successfully to assert a lien upon a domestic vessel. These statutes differed somewhat in their provisions, and differences in their wording gave rise to differences of decision in the various federal circuits. These circuits also differed one from another in the construction of these state statutes even when they were practically identical in their wording. The present federal act practically supersedes these various state statutes.

The act prescribes that the lien shall exist when any person shall have furnished supplies, etc., to a vessel upon the order of the owner or of some one by the owner authorized. It further provides that any person to whom the management of the vessel at the port of supply shall have been intrusted shall be presumed to have been so authorized. A charterer is clearly such a person.

Nearly all the claims of maritime liens herein are predicated of the making of repairs or the furnishing of supplies or other necessaries to the Oceana upon the order of the Bermuda-Atlantic Steamship Company, the New York corporation, which most of the lien claimants assumed to be the owner of the vessel, and which others of the lien claimants were informed by Manson, or others officially connected with that company, was such owner. None of the maritime lien claimants knew of the existence of the two corporations, owner and charterer, respectively, and I cannot see that there has been proof of any circumstance brought to their attention that should have caused the making of inquiry as to the actual authority of the company which was in possession of and operating the ship to bind the vessel for repairs, supplies, and like necessaries. The only suggestion of a circumstance which, it is claimed, should have given rise to such inquiry, is that the vessel had plainly marked upon her stern the name of her port of registry, to wit, Toronto. But this alone amounted to nothing, because foreign registry and domestic ownership are not incompatible, and, even if they were, none of the lien claimants knew whether the Bermuda-Atlantic Steamship Company was a domestic or a Canadian corporation.

The language of the federal act to the effect that nothing in the act shall be construed to confer a lien when the furnisher knew or by the exercise of reasonable diligence could have ascertained that because of the terms of a charter party or for any other reason the person ordering the repairs, etc., was without authority to bind the vessel therefor is clearly by way of proviso. It must, as a proviso, be harmonized with the general purpose of the act, which was "to make the management of a vessel at its port of supply presumptive evidence of the right to bind it for supplies there furnished." The City of Milford (D. C.) 199 Fed. 960. It does not appear that if inquiry had been made by them—that is, such inquiry as a business man would be apt to make and such as the law would style reasonable—the lien claimants would have been any the wiser, and the burden to show that reasonable inquiry would have made them acquainted with the actual situation is upon those who seek to avail themselves of the proviso. The cases cited by counsel for the trust company as illustrating the rule which requires the dismissal of an indictment that fails to negative exceptions contained in the statute under which the indictment is had are not in point, because we are dealing with a proviso and not with an exception, and there is a familiar distinction between them in reference to the burden of proof. Potter's Dwarris Stat. 119. It is significant that none of the officers of the New York Company was produced as a witness except Manson, and Manson testified that he regarded his company as the owner of the vessel and has not contradicted those lien claimants that testified that he told them such was the fact. It does not appear that inquiry of others would have resulted in the ascertainment of the real relations of the company to the vessel.

It follows that on both of the grounds above examined the claims of maritime liens filed herein for "repairs, supplies, or other necessaries" should be sustained.

J. Parker Kirlin, of New York City, for mortgagee.
Herbert Green, of New York City, for Berwind-White Co.
James Armstrong, of New York City, for Morse Dry Dock Co.
J. Dexter Crowell, of New York City, for Robbins Dry Dock & Repair Co.
Charles Hickox, of New York City, for receiver.

HAND, District Judge.  [1] The Canada Company was organized, as all agree, only to hold the title to the Oceana so as to avoid the laws of the United States.  Not only was there no independent interest outstanding, but the complete actual management of the vessel and of the Canada Company was in the hands of the New York Company.  The Canada Company never did anything, or was meant to do anything, except hold the title to the vessel, give the mortgage and charter, and get the registry; it carried on no subsequent business thereafter, and its directors were mere dummies directed by the New York Company.

This case depends simply upon whether, under these circumstances, the New York Company was either an owner, or a person authorized by the owner to order the supplies.  We may, for the sake of argument, allow that the corporate entities remained distinct, and that the equitable title was in the Canada Company, so that a convenient fiction shall not become confused, and we shall retain the shorthand of clear concepts.  When, however, we come to the question of authority, we are not bound by the whole sleight-of-hand paraphernalia of resolutions, deeds, leases, mortgages, and the like, because authority may rest in pais, and one may have authority to act for a corporation without the formal action of its board of directors.  Phillips v. Campbell, 43 N. Y. 271.  So the question changes form into whether the New York Company had such authority from the Canada Company.  Their relations are so intricately interwoven that either may be regarded as the agent of the other without violence to the facts, though eventually it must be recognized that the only actor was the New York Company.  It will do as well as any way to think of the New York Company as agent and the Canada Company as principal, or owner, and to think of the basis de jure of the New York Company's authority as depending upon the knowledge and acquiescence of all the principal's stockholders (i. e., the New York Company itself), and of its directors, who were merely its puppets, who consented to whatever they were told to do, and who in fact did nothing.  In such a situation, when the knowledge is clearly brought home to the stockholders and directors, there is a valid ratification.  Pennsylvania R. R. v. Keokuk Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770, 33 L. Ed. 157.  It is, of course, true that the New York Company had no right as against the mortgagee to incur these liens, or the Canada Company to authorize them, for they violated the mortgage, but that does not affect the question whether the New York Company had actual authority from the Canada Company, which is the relevant question under section 1 of this act.  Nor does it affect that authority

that there had been previously executed a charter party which pro-- vided to the contrary, because these orders for supplies were given after the charter party was signed, and with the fullest acquiescence of the Canada Company.

[2] I am not quite clear that the mortgagee agrees that, if the Canada Company had given formal authority to the New York Company to create the liens, they would have been valid in the face of the mortgage; but there cannot be any question of that, for the statute gives a lien for supplies on the owner's order or his agent's, in that respect differing from the maritime law, which it changed. The St. Jago de Cuba, 9 Wheat. 410, 417, 6 L. Ed. 122. Furthermore, I need not consider the result, had the lienors known the terms of the mortgage, for no one contends that they are so chargeable; and, since they did not know of the mortgage, it is of no moment whether they knew of the charter party, because it is only when the charterer orders supplies without real authority that the question can arise under the proviso of section 3. In other words, since the charter did not refer to the mortgage, knowledge of it would only have shown that originally the Canada Company had refused an authority which, as a matter of fact, the New York Company had been exercising with the complete acquiescence of the Canada Company for some time. It is therefore irrelevant to inquire how far the lienors were put on notice of the charter party, under The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, and The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512.

Certainly any other result would be absurd. The statute means to give a lien when the owner orders the supplies or when any one having apparent authority orders for him. The proviso is only to protect the owner against the charterer if he has tried to protect himself. It does not try to protect prior mortgagees, nor does it prevent the owner from agreeing that the charterer may order supplies which will become prior liens to a mortgage. Bearing this in mind, it would be unreasonable to apply the protection of the proviso to the Canada Company. To protect it against the New York Company was to protect it against itself, for it had no independent existence. Unless the mortgage would have been good even against a formal resolution conferring authority by the directors of the Canada Company, it is not good against the course of conduct here shown. We should not suppose that the charter party was intended, as a kind of moral bulwark protecting the Canada Company against subsequent changes of mind of its own controlling spirits. There is no magic about the drawing of corporate papers.

The relations between these corporations are not to be measured, as the mortgagee seems to suppose, merely by the fact that one owned all the stock of the other. I agree that there is nothing in itself illegal in holding all the stock of a corporation and doing business in the corporate form, if you really mean to do it that way and everybody knows it. Salomon v. Salomon & Co., [1897] A. C. 22; C. Crane & Co. v. Fry, 126 Fed. 278, 61 C. C. A. 260; Gramophone Typewriter,

Ltd., v. Stanley, 99 Law Times Rep. 39. Yet, on the other hand, there is nothing merely in the fact that you have adopted a corporate form, which prevents you from so interjecting yourself into the corporate business as to become the principal though the form remain corporate. Chicago Junction Ry. Co. v. U. S., 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226. If, as here, you not only own all the stock, but also personally conduct the whole of the supposed corporate affairs, disregarding the corporate forms, you may be doing the business yourself, or at least your corporation may be an agent only. Apthorpe v. Peter Schoenhofen Breweries, Ltd., 80 Law Times Rep. 395. In the case at bar, it is, however, not necessary to take that final step, for even with the strictest observance of formalities we must say that the Canada Company authorized the New York Company to do all it did.

This disposes of all the general objections to the claims. The mortgagee does not except to the Morse claim as insufficiently proved, and it is clear that the receiver is bound by the account stated between the New York Company and the lienor for the bills rendered on December 16th and 29th, January 9th, and March 11th. Not only was acquiescence shown by failure to object, but by 12 large payments. The small items of May 31st and June 8th probably are not so proved, but I scarcely suppose these are seriously disputed.

In its brief the mortgagee also objects to claims 28, 29, 40, 41, 42, 43, and 44; but there are no exceptions to any of them, either of the mortgagee, or the receiver. The sixth exception of the receiver does not cover these, and I can find no exception of the mortgagee which even suggests any of these specific liens, though others are mentioned in some of the exceptions. It would hardly be fair to those lienors upon such a record to allow their liens to be attacked. They may have been content to let the larger lienors carry the main questions, and may have therefore defaulted in reliance upon the absence of any specific exceptions to their own liens.

As to the disbursements the mortgagee and receiver will have to share them equitably. It is a little hard to know what proportion will be equitable, and if the parties cannot agree they will have to submit the matter again.

A decree may be submitted in accordance with this opinion.